UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Criminal No. 21cr10047 |
| | ) |
| v. | ) Violations: |
| | ) |
| MARK JOSEPH AHN, | ) Counts One and Two: |
| | ) Securities Fraud |
| Defendant | ) (18 U.S.C. § 1348) |
| | ) |
| | ) Forfeiture: |
| | ) (18 U.S.C. § 981(a)(1)(C) and 28 |
| | ) U.S.C. § 2461(c)) |

INFORMATION

At all times relevant to this Information:

General Allegations

1. The defendant, MARK AHN ("AHN"), was a resident of Oregon. Before 2017, AHN was a senior executive at multiple biotechnology firms. In addition, between approximately 2006 and 2016, he was a member of the board of directors of Company A and of its predecessor company, and he served as the board's vice-chairman. Starting in January, 2017, he served as a paid consultant to Company A.

2. Company A was a publicly-traded biotechnology company based in New York.

3. Dimension Therapeutics, Inc. ("Dimension") was a biotechnology company with its principal place of business in Cambridge, Massachusetts that developed gene therapies for liver disorders. Dimension was an issuer of securities registered under Section 12 of the Securities Exchange Act of 1934 (the "Exchange Act") and was required to file reports under Section 13 of the Exchange Act. Shares of Dimension were publicly traded on the National Association of Securities Dealers Automated Quotations Stock Market ("NASDAQ"), a national securities exchange, under the symbol "DMTX."

### Background to the Insider Trading Scheme

4. As a member of Company A's board of directors, AHN provided business development advice to Company A. He worked with Company A's chairman and its chief operating officer ("COO") and, starting in or about 2015, with its chief executive officer ("CEO"). As part of his job, AHN had access to material nonpublic information ("MNPI") about, among other things, Company A's business, including the financial terms of its potential acquisitions of other companies, as well as MNPI about other companies, including financial information that they disclosed to Company A pursuant to confidentiality agreements. AHN owed a duty of trust and confidence to Company A and its shareholders and was subject to the company's insider-trading policy, which prohibited him from, among other things, trading in Company A's stock while in possession of MNPI.

5. In or about late 2016, AHN resigned from Company A's board of directors. He thereafter entered into a consulting agreement with Company A. Under the terms of that agreement, AHN continued to have access to MNPI about Company A and other companies that provided information to Company A under the terms of confidentiality agreements, and he continued to owe a duty of trust and confidence to Company A and its shareholders. The consulting agreement specifically prohibited AHN from using, for his personal benefit, confidential financial and business information disclosed to him in the course of his work for Company A.

### The Insider Trading Scheme

6. Beginning in about April, 2017, and continuing through in or about August, 2017, AHN obtained MNPI about, among other things, the fact that Dimension was for sale and the financial terms pursuant to which it might be sold to Company A or to a competitor company.

Beginning in or about July, 2017, in violation of the duties of trust and confidence AHN owed to Company A, and while in possession of the MNPI, AHN traded in shares of Dimension in his personal brokerage accounts in an effort to earn profits based on the subsequent public disclosure of that information.

7. As part of the scheme, on or about April 17, 2017, AHN learned from Company A's chairman that Dimension was seeking a merger partner. Based on this information, Company A's CEO contacted Dimension, and AHN began analyzing Dimension's business, focusing on its licenses of genetic technology from a third party.

8. On or about April 28, 2017, Company A and Dimension entered into a mutual nondisclosure agreement to share certain MNPI in anticipation of a possible merger. The companies entered into two additional confidentiality agreements on or about May 31, 2017, and August 4, 2017.

9. The May 31, 2017 confidentiality agreement noted, among other things, that "United States securities laws prohibit any person who has received material, non-public information with respect to an issuer, including, without limitation, material non-public information of the type which is the subject of this letter agreement, from purchasing or selling securities of such issuer." The agreement highlighted "the fact that discussions or negotiations are taking place concerning [a merger] or any of [its] terms, conditions or other facts" as particularly sensitive information.

10. Beginning on or about May 1, 2017, and continuing through August 25, 2017, Company A and Dimension exchanged confidential business information and discussed the terms of a potential merger. Company A and Dimension exchanged information through, among other

things, in-person meetings in Woburn and Boston, Massachusetts, and through electronic data sharing.

11. Company A took steps to maintain the secrecy of its negotiations and to avoid the disclosure of MNPI about the possible merger. For example, in internal documents and communications about the merger, Company A, and AHN, referred to Dimension as "Diamond" and referred to the potential deal as "Project Diamond."

12. Dimension also took steps to keep the negotiations secret, including by referring internally to Company A as "Arbois," and the potential sale of the company as "Project Dionysus."

13. AHN advised Company A's senior management throughout its secret negotiations with Dimension, participated in the due diligence process, and had access to MNPI concerning Dimension that Company A received from Dimension.

14. On or about May 10, 2017, Company A's chairman and its CEO met with Dimension officers in Massachusetts to discuss the possible merger.

15. Five days later, on or about May 15, 2017, Company A sent Dimension a term sheet describing a possible acquisition of Dimension in a stock-for-stock transaction that did not imply a premium to Dimension's then-current stock price.

16. On or about May 22, 2017, AHN participated by telephone in a strategy meeting concerning the merger with Company A's chairman and COO. AHN thereafter participated in similar meetings with Company A's senior officers to discuss Project Diamond in June, July, and August 2017.

17. On or about May 30, 2017, Company A's CEO and COO met with Dimension officers in Boston to discuss the merger.

18. On or about June 23, 2017, while in Massachusetts, AHN received an email from Company A's chairman notifying him that Dimension had set up a formal process using a business consultant to evaluate proposals to acquire the company and that Dimension requested that such proposals from potential acquirers be submitted to Dimension's business consultant by July 6, 2017.

19. That same day, while in Massachusetts, AHN accessed the website of USAA, an investment company. AHN subsequently signed and submitted to USAA an application to open a brokerage account.

20. Between about June 24, 2017, and July 5, 2017, AHN advised Company A management on the terms of a revised merger proposal that Company A sent to Dimension on or about July 6, 2017. The revised proposal offered to acquire Dimension in an exchange of stock that implied a premium of approximately 8 percent to Dimension's then-current stock price.

21. On or about July 13, 2017, Dimension's business consultant informed Company A that the 8 percent premium in Company A's proposal to acquire Dimension was too low.

22. Thereafter, AHN assisted in the drafting of a second revised proposal by Company A to acquire Dimension for an even higher price.

23. On or about July 21, 2017, while in possession of MNPI about, among other things, the fact that Dimension had received merger offers, the terms of Company A's proposal to buy the Dimension at a premium to its stock price, and the fact that Dimension would only accept an offer with more than an 8 percent premium, AHN purchased 2,868 shares of Dimension stock in the USAA brokerage account for $1.35 per share.

24. On or about July 31, 2017, Company A sent the second revised proposal to Dimension, offering to acquire the company in an exchange of stock that implied a premium of approximately 83 percent to Dimension's then-current stock price.

25. That same day, while in possession of MNPI about, among other things, Company A's second revised proposal, AHN entered a limit order to buy 25,000 shares of Dimension stock in his Merrill Lynch brokerage account at a price no higher than $1.40 per share. The order was executed in a series of transactions that began that day and continued through August 7, 2017.

26. On or about August 25, 2017, Dimension announced that it had agreed to be acquired by Company B, a competitor corporation. Immediately following the announcement, Dimension's stock price increased by approximately 163 percent to close at $3.15 per share, on over 4 million shares traded, compared to only 22,495 shares traded the prior day.

27. AHN sold the 25,000 shares of Dimension in his Merrill Lynch brokerage account on or about August 30, 2017, for $3.15 per share.

28. On or about September 7, 2017, AHN transferred the remaining 2,868 Dimension shares in the USAA account to his Merrill Lynch account, and he sold them the following day for $3.80 per share.

## COUNTS ONE AND TWO
Securities Fraud
(18 U.S.C. § 1348)

The U.S. Attorney charges:

29. The U.S. Attorney re-alleges and incorporates by reference paragraphs 1-28 of this Information.

30. On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant,

MARK JOSEPH AHN,

did knowingly execute and attempt to execute a scheme and artifice to defraud persons in connection with securities of an issuer with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, in that AHN traded in the shares of Dimension Therapeutics, Inc. while in possession of material nonpublic information about that company, as indicated below:

| COUNT | APPROXIMATE DATES | TRANSACTION |
|---|---|---|
| 1 | July 21, 2017 | Order to Purchase DMTX Stock |
| 2 | July 31, 2017 | Order to Purchase DMTX Stock |

All in violation of Title 18, United States Code, Section 1348.

## FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

31. Upon conviction of one or more of the offenses in violation of 18 U.S.C. § 1348 set forth in Counts One and Two, the defendant,

MARK JOSEPH AHN,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

32. If any of the property described in Paragraph 31, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 31 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By: _____
Kriss Basil
Assistant United States Attorney